IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **LARRY D. GEORGE,** | ) |
| | ) |
|    **Plaintiff,** | ) |
| | ) |
|        v. | )  CIVIL ACTION NO. CV-07-BE-01735-S |
| | ) |
| **MICHAEL J. ASTRUE** | ) |
| **Commissioner of the Social,** | ) |
| **Security Administration,** | ) |
| | ) |
|    **Defendant.** | ) |

**MEMORANDUM OPINION**

**I. Introduction**

The claimant, Larry George, brings this action seeking judicial review of the final decision of the Commissioner of Social Security that denied his claim for Social Security Disability Insurance (SSDI) benefits and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act.

On July 25, 2003, the claimant protectively filed a Title II application for a period of disability and disability insurance benefits. The claimant also protectively filed a Title XVI application for supplemental security income at the same time. In both applications, the claimant alleged disability beginning March 13, 2003. The Commissioner denied the claims at the initial level on January 30, 2004. Thereafter, the claimant filed a timely written request for a hearing on February 9, 2004. The claimant appeared and testified at a hearing before an Administrative Law

Judge (ALJ) held on July 1, 2005, in Birmingham, Alabama. The claimant was represented by counsel, and a vocational expert testified.

On August 19, 2006, the ALJ denied the claimant's application for both SSI and SSDI benefits. On May 25, 2007, the appeals council denied the claimant's request for review. This denial constituted the final decision of the Commissioner of the Social Security Administration. The claimant, therefore, has exhausted all administrative remedies, and this court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, the court will AFFIRM the decision of the Commissioner.

## II. Issues Presented

The claimant has raised three issues for this court to address.

> 1) whether the ALJ rejected the testimony of a consulting physician without adequate cause or rationale;
>
> 2) whether the ALJ's Residual Functional Capacity assessment was based on substantial evidence; and
>
> 3) whether the ALJ failed to consider the claimant's combination of impairments as falling within Listing 12.05(C).

## III. Standard of Review

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions,

including determination of the proper standards to be applied in evaluating claims*.*" *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. Furthermore, this court does not reweigh evidence or substitute its judgment for that of the Commissioner, but instead reviews the entire record to determine if the decision reached is supported by substantial evidence. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991). Finally, the claimant has the burden of proving that an impairment meets or equals a listed impairment. *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991). The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999.  A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but the court must also view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

### IV. Legal Standard

A person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A)   To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?

> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt 404, Subpt. P, App.1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); *see also* 20 C.F.R. §§ 404.1520, 416.920.

The ALJ may reject the opinion of any physician when evidence supports a contrary conclusion, if he or she states adequate reasons for doing so. *Syrock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

Furthermore, this court does not reweigh evidence or substitute its judgment for that of the Commissioner, but instead reviews the entire record to determine if the decision reached is supported by substantial evidence. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991).

Finally, the claimant has the burden of proving that an impairment meets or equals a listed impairment. *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991).

### V. Facts

The claimant, Larry George, was forty-four at the time of the ALJ's decision. (R. 31). The claimant graduated high school in the special education program. (R. 360). He had previously worked as an auto dealer, a warehouse cleaner, a construction laborer, and a tombstone deliverer. (R. 370). The claimant alleges he has been disabled since March 13, 2003, due to bilateral avascular necrosis of the hip and IQ functioning in the mild to borderline mental retardation

range. (Claimant's brief, p. 1). The claimant has not engaged in any gainful employment since that time. (R. 27).

*Physical Limitations*

In May 1998, the claimant sustained a torn lateral meniscus in the right knee while working as a construction laborer. (R. 151). As a result, Dr. Buggs performed knee surgery on the claimant. (R. 151). Post surgery, Dr. Buggs noted the claimant was "healing satisfactory" and was ready to begin physical therapy. (R. 150).

Subsequently, in May 1999, while working as a tombstone deliverer, the claimant fell in a grave site, causing further pain and swelling in his right knee. (R. 149). The claimant returned to Dr. Buggs. (R. 149). Dr. Buggs found "mild effusion of the knee," and that the claimant's "[r]ange of motion is decreased in flexion and extension." (R. 149). Dr. Buggs recommended physical therapy and planned to re-evaluate the claimant after one week. (R. 149). Dr. Buggs determined that, after a recheck "we will possibly return him to work." (R. 149). After the recheck, the claimant did in fact return to work. (R. 146).

In October 1999, the claimant returned to Dr. Buggs because of pain in both legs "that begins in his hip and extends down to the lower extremity part of the distal tibia bilaterally." (R. 147). Dr. Buggs further noted "no point tenderness in the lower extremity" but "possible gouty arthritis." (R. 146). Dr. Buggs noted, however, that the claimant had an "essentially negative exam" with full range of motion of the lower extremities. (R. 146).

Dr. Wellman examined the claimant on different occasions from 1998-2003. (R. 155). Dr. Wellman noted that the claimant had bilateral lower extremity swelling and redness, and that both legs were swollen around the knee. (R. 155) Nevertheless, following her periodic

examinations, Dr. Wellman consistently noted that the claimant could return to work. (R. 170-194).

Examining the claimant at Cooper Green Hospital on August 27, 2003, Dr. Weaver found the claimant had "destruction of the joint spaces in both hips with alteration of the femoral head consistent with old avascular necrosis." (R. 270). Furthermore, Dr. Weaver found that the claimant's "joints [had] been almost completely destroyed." (R. 270). Therefore, on September 11, 2003, the claimant underwent a left total hip arthroplasty "without any complications." (R. 320). The discharge report on September 15, 2003, noted the claimant had "progress[ed] to independence with his activities of daily living." (R. 320). Furthermore, on November 19, 2003, the claimant underwent right total hip arthroplasty. (R. 317). At the time of discharge from Cooper Green, Dr. Weaver found the claimant had "improved" and "tolerated [the operation] well." (R. 312). Dr. Weaver ordered a follow up with the orthopedic clinic and outpatient physical therapy. (R. 312).

On January 27, 2004, Dr. Stephenson, a DDS physician, completed a Residual Physical Functional Assessment. (R. 275). Based on the claimant's medical records to date, the DDS physician determined that the claimant could occasionally lift and carry twenty pounds, could walk or stand about six hours in an eight hour workday, and could sit with normal breaks for a total of six hours throughout an eight hour work day. (R. 276). Furthermore, the DDS physician determined the claimant could occasionally stoop, kneel, crouch, and crawl. (R. 278).

In February 2005, the claimant visited Dr. Watson at the Cooper Green orthopedic clinic. (R. 287). Dr. Watson found the claimant was "doing well" but suffered from "occasional" hip pain. (R. 287). Additionally, Dr. Watson found the claimant could return to engaging in "light

work" that did not require any "heavy lifting" or "extensive" walking or running. (R. 287).

*Mental Limitations*

In November 2003, the claimant underwent a Disability Determination Services (DDS) psychological evaluation by a consulting specialist, Dr. Neville, Ph. D. (R. 220). Dr. Neville found no abnormalities that might interfere with communication. (R. 222). Additionally, Dr. Neville noted that the claimant's mood appeared stable and appropriate "to the content of his thoughts." (R. 222). The claimant could calculate simple addition and subtraction problems, but he was unable to multiply or divide. (R. 222). The claimant was able to count backwards from twenty. (R. 222). The claimant recalled three out of three items immediately after presentation, and again after a five minute delay. (R. 222). Dr. Neville noted no loose associations, tangential thinking, or confusion. (R. 222).

The claimant described his daily activities to Dr. Neville. (R. 223). The claimant stated that he read the newspaper and watched television; that he relied on his sister to wash his feet, put on his socks and shoes, and tie his shoes; and that while he had cooked, shopped for groceries, and done his own laundry in the past, his sister was completing these tasks at the time of Dr. Neville's evaluation. (R. 223). Furthermore, the claimant stated he previously had a driver's license, but stopped driving in March of 2003 because of pain and mobility issues. (R. 223). Also, the claimant stated that, in the past, he had taken care of his own finances. (R. 223). Finally, Dr. Neville noted that the claimant had gone through an alcohol detoxification and rehabilitation program in 1993. (R. 221). The claimant stated that he had begun drinking heavily again recently because of his increase in severe pain. (R. 221).

Dr. Neville then gave the claimant a WAIS-II IQ test. (R. 222). The claimant obtained a

Verbal Scale IQ score of 67, a Performance Scale IQ score of 69, and a Full Scale IQ score of 65. (R. 222). These numbers placed the claimant in the Mild Mental Retardation range. (R. 222). However, Dr. Neville determined that these results underestimated the claimant's true abilities. (R. 223). Dr. Neville indicated that the claimant "rushed through many of the test items" and was judged to be "much less persistent than the typical claimant." (R. 223). Taking into account the claimant's academic history of graduating from high school in special education and his past daily living skills, Dr. Neville concluded the claimant's abilities likely fell within the "[b]orderline range of intellectual functioning." (R. 223). Based on this information, Dr. Neville concluded that the claimant's ability to "understand, remember, and follow through with simple routine work instructions would be limited to a moderate degree." (R. 223).

On November 25, 2003, DDS physician Dr. Powers reviewed the claimant's medical records to complete a mental residual capacity assessment. (R. 238). Dr. Powers determined that the claimant had "no significant [mental] limitations."(R. 240). Dr. Powers found that the claimant had no significant limitations on his ability to remember work-like procedures, carry out simple instructions, sustain an ordinary routine, make simple work-related decisions, and complete a normal workweek without interruptions from psychologically based symptoms. (R. 238).

*The ALJ Hearing*

After the Commissioner denied his claims for Social Security Disability Benefits initially, the claimant requested and received a hearing before the ALJ on July 1, 2005. (R. 352-374). At the hearing, the claimant stated that he could not stoop, but could put on his clothes. (R. 364). The claimant stated that he did not watch television because he could not sit longer than ten to

8                                              8

twenty minutes before having to re-adjust. (R. 366). Furthermore, the claimant stated that he could only stand for five to ten minutes at a time, and had to spend around twenty minutes lying down a day. (R. 367).

A vocational expert, Dr. Kessler, testified concerning the availability of jobs that the claimant was capable of performing. (R. 370). First, Dr. Kessler stated that, with his physical limitations, the claimant was unable to perform the heavy, unskilled work he had engaged in previously. Then, the ALJ asked Dr. Kessler to assume the claimant was precluded from the operation of foot or leg controls; limited to occasional stooping, bending, crouching, and crawling; and precluded from jobs that "would require the satisfaction of production quotas." (R. 371). With these limitations, Dr. Kessler concluded an individual could perform work as a cashier, counter clerk, retail salesman, light truck driver, food preparer, and crossing and security guard worker at the unskilled level. (R. 371).

Additionally, the ALJ asked Dr. Kessler to further assume that the claimant required a job that permitted a sit or stand option. (R. 371). Dr. Kessler responded that the sit or stand option precluded all work other than sedentary cashier work. (R. 372). Dr. Kessler stated that there "would be approximately 5,000 sedentary cashier jobs that would meet that description."(R. 372). However, the ALJ asked Dr. Kessler, "[I]f I should find the Claimant's testimony to be fully credible and supported by the record as a whole, would he be able to return to his past relevant work or any other work?" Dr. Kessler responded that the claimant would be precluded from all work if the claimant's testimony was found to be wholly credible. (R. 372).

Finally, because the claimant's record lacked a "detailed" medical examination since December of 2003, the ALJ ordered the Social Security Administration to provide the claimant

with the opportunity to undergo another Disability Determination Examination. (R. 373).

*Disability Determination Examination*

On August 31, 2005, Dr. Livingston examined the claimant. (R. 329). Dr. Livingston noted the claimant's persistent pain from bilateral aseptic necrosis of the hips despite the previous corrective operations. (R. 329). Dr. Livingston determined that the claimant could elevate his shoulders to 150 degrees before pain set in. (R. 330). Furthermore, the claimant's wrist and elbows "showed a full range of motion." (R. 330).

Moreover, while the claimant could only stand a half hour total in an eight hour day, Dr. Livingston found the claimant could sit for an unlimited amount of time. (R. 333). However, the claimant did not have the ability to lift or carry any amount of weight, and could never balance, stoop, kneel, crouch, or crawl. (R. 333). In addition, the claimant could never drive automotive equipment. (R. 335). Dr. Livingston indicated that he did not base his evaluation primarily on the claimant's subjective complaints. (R. 335). Dr. Livingston concluded that the claimant had "probably degenerative changes" and "will have to live with the pain." (R. 329).

*The ALJ's Decision*

On August 19, 2006, the ALJ issued an unfavorable ruling, finding the claimant was not disabled under the Social Security Act. (R. 23). First, the ALJ found the claimant had not been engaged in any substantial gainful activity "at any time relevant to [the] decision."(R. 27). Second, the ALJ found that the claimant had severe impairments, including "residuals from hip placement surgery, knee surgery, and borderline intellectual functioning." (R. 27). Third, the ALJ determined that the claimant did not have "an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P,

Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." (R. 28). In reaching this conclusion, the ALJ noted the claimant had "mild restriction of activities of daily living, mild difficulties in maintaining social function; and moderate difficulties in maintain [sic] concentration, persistence or pace; and no episodes of decompensation of extended duration." (R. 28). The ALJ found these mental limitations restricted the claimant to performing unskilled entry level work not requiring the satisfaction of production quotas. (R. 29).

Fifth, after considering the claimant's residual functional capacity, the ALJ concluded that the claimant could perform sedentary unskilled work permitting a sit or stand option. (R. 29). Furthermore, the work could require only occasional stooping, bending, crouching, and crawling, but neither the operation of foot or leg controls, nor the satisfaction of production quotas. (R. 29).

The ALJ rejected the claimant's allegations of hip and knee pain as "not fully credible or supported by the medical evidence as a whole." (R. 29). The ALJ noted that no treating or examining physician found the claimant's impairments, or combination of impairments, severe enough to preclude all work. (R. 29). Specifically, the ALJ accorded "great weight to the opinion of the treating physicians at Cooper Green that the claimant can perform light work but would be precluded from heavy lifting or extensive walking or running." (R. 30).

Regarding the partially conflicting testimony of Dr. Livingston, the ALJ accepted Dr. Livingston's "opinion that the claimant is able to sit without limit, but reject[ed] [Dr. Livngston's] opinion regarding the other limitations, as they are inconsistent with independent living." (R. 30). The ALJ did not believe any evidence suggested the claimant's impairments were congruent with the limitations Dr. Livingston placed on the claimant. (R. 30).

Regarding Dr. Stephonson's findings of physical residual functional capacity assessment,

the ALJ found the assessment to be generally supported by the record. (R. 30). However, the ALJ determined that "the claimant would be more limited in lifting and standing/walking [than] as noted in the DDS opinions." (R. 30). This conclusion rested on evidence that Dr. Stephonson did not have a complete record when evaluating the claimant's record. (R. 30).

Addressing the claimant's mental limitations, the ALJ determined these limitations did not preclude all work. (R. 30). The ALJ noted that he gave "great weight" to the DDS psychologists Dr. Neville and Dr. Powers. (R. 30). The ALJ concluded that the mental assessments were supported by the record and "rendered by specialists who are familiar with the SSA program." (R. 30).

Finally, based on the vocational expert's findings, the ALJ determined that the claimant was unable to perform any past relevant work, but was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 32). Therefore, the ALJ determined the claimant was not disabled as defined by the Social Security Act. (R. 32).

## VI. Discussion

The claimant raised three issues for this court to consider: (1) whether the ALJ rejected the opinion DDS consulting physician Dr. Livingston without adequate rationale; (2) whether the ALJ's Residual Functional Capacity assessment was supported by substantial evidence; and (3) whether the ALJ failed to consider the claimant's combination of impairments as falling within Listing 12.05(C). These issues will now be addressed in turn.

**1) The ALJ accorded proper weight to Dr. Livingston's medical opinion.**

The claimant argues that the ALJ disregarded Dr. Livingston's opinion without adequate cause or rationale. That the ALJ must specifically articulate the weight accorded to different medical opinions is firmly rooted in Eleventh Circuit jurisprudence. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1986). However, the ALJ may reject the opinion of any physician when evidence supports a contrary conclusion, if he or she provides adequate reasons for doing so. *Syrock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). Furthermore, when the opinions of treating physicians and consulting physicians conflict, the ALJ must accord substantial or considerable weight to the treating physician's opinion unless "good cause" is shown. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988).

Here, the ALJ provided two specific reasons for rejecting consulting physician Dr. Livingston's opinion that the claimant could *never* lift *any* weight and could *never* climb, balance, crawl, or stoop. First, the ALJ noted that the treating physicians at Cooper Green determined that the claimant could return to "light work." (R. 30). Athough the claimant alleges that Dr. Livingston's opinion precludes him from sedentary work, the ability to perform light work necessarily includes the ability to perform sedentary work. *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987). Thus, the ALJ noted the conflicting medical testimony, and then properly indicated that he accorded "great weight" to the treating physicians' opinion, rather than that of consulting physician, Dr. Livingston. Second, the ALJ expressly found that the physical limitations Dr. Livingston noted were inconsistent with the independent living that the claimant had engaged in for years, including putting on his own clothes and doing his own laundry, providing additional substantial evidence that there existed no "good cause" to credit Dr.

Livingston's opinion more than that of the treating physicians. (R. 30). Therefore, the ALJ did not arbitrarily reject the medical testimony of Dr. Livingston.

**2) The ALJ's Residual Functional Capacity findings are supported by substantial evidence.**

The claimant argues that the ALJ's Residual Functional Capacity findings are contrary to the substantive evidence of the record. This court does not reweigh evidence or substitute its judgment for that of the Commissioner, but instead reviews the entire record to determine if the decision reached is supported by substantial evidence. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001).

Here, the ALJ relied on medical evidence and the record as a whole to determine that the claimant could perform a sedentary job with the option to sit or stand. Though the claimant asserts he has limitations regarding the ability to sit, no physician has indicated that the claimant has any such limitation. Furthermore, while it is undisputed that the claimant has physical limitations of the legs and hips, no physician, other than Dr. Livingston, has indicated any material upper body limitations. Moreover, even Dr. Livingston noted the claimant had full range of motion in the elbows and wrists. Again, the treating physicians at Cooper Green indicated the claimant could return to "light work." Furthermore, these treating physicians did not indicate any limitation on the ability to stoop, bend, crouch, or crawl. Additionally, Dr. Wellman, who saw the claimant periodically for a number of years following his injuries, consistently indicated that the claimant *could* return to work. Therefore, substantial evidence in the record supports the

14

ALJ's decision that the claimant can perform limited sedentary work.

### 3) The ALJ properly rejected the claimant's disability claim under listing 12.05(C).

The claimant argues that the ALJ failed to properly consider his claim under Listing 12.05(C). The claimant asserts that the ALJ should have found that his IQ scores coupled with his avascular necrosis and chronic pain met or equaled Listing 12.05(C). The claimant has the burden of proving that an impairment meets or equals a listed impairment. *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991)."To be considered for disability benefits under section 12.05, a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." *Crayton v. Callahan*, 120 F.3d 1217, 1219-20 (11th Cir. 1997). To establish a disability under section 12.05(C), a claimant must establish "a valid verbal, performance, or full scale IQ score of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). However, a valid IQ score need not be conclusive of mental retardation where the IQ score is inconsistent with other evidence in the record of the claimant's activities and behavior. *Lowery v. Sullivan*, 972 F.2d 835, 837 (11th Cir. 1992).

In the present case, the ALJ did not err in rejecting the claimant's disability claim under Listing 12.05(C), because the claimant failed to meet his burden in proving his combination of impairments met or equaled the Listing. The claimant merely offered that his IQ scores coupled with avascular necrosis should result in the finding of disability under 12.05(C). (Claimant's brief p. 10). However, the ALJ made the factual determination that the claimant's IQ scores were

inconsistent with the claimant's activities and behavior. The ALJ noted that Dr. Neville, who conducted the IQ tests, found the claimant's IQ scores underestimated his true abilities when juxtaposed with his daily activities and level of education. Indeed, Dr. Neville noted that, in the past, the claimant had independently cooked, done laundry, and handled his own finances. (R. 223). Additionally, the ALJ noted that Dr. Neville believed the claimant had rushed through the IQ tests. (R. 223). Thus, the ALJ found the claimant's mental deficiencies resulted in only mild restrictions that allowed for unskilled entry level work that does not require satisfying production quotas. (R. 29). Neither the claimant, nor the record as a whole, offer anything to contradict the ALJ's conclusion. Therefore, the ALJ did not err in rejecting the claimant's disability claim under 12.05(C), because the claimant did not meet his burden of proving disability under a listing.

### VII. Conclusion

Because each of the three issues the claimant raises fails to establish a reversible error, the court AFFIRMS the Commissioner's decision. The court will enter a separate order consistent with this opinion.

DONE and ORDERED this 30th day of June, 2009.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE